IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Akilah Rogers,<br><br>Plaintiff,<br><br>v.<br><br>Voltron Data, Inc. and Joshua Patterson,<br><br>Defendants. | Case No.<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Akilah Rogers ("Rogers" or "Plaintiff"), by and through her attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendants Voltron Data, Inc. ("Voltron Data") and Joshua Patterson ("Patterson") (collectively, "Defendants") and states as follows:

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the Plaintiff and Defendants are residents of different states and more than $75,000 is in controversy. Venue is proper in the District of Columbia pursuant to 28 U.S.C. §1391(b) because a "substantial part of the events or omissions giving rise to the claim occurred" in this District.

## PARTIES

2. Defendant Voltron Data is a deep tech data augmentation start-up that launched in 2021. The company received over $100 million in initial funding from BlackRock, Anthos Capital, Battery, Coated, GV, Lightspeed Venture Partners, Nepenthe Capital, Redline Capital, and The Factory. Its largest investor is Walden Catalyst, led by managing director Lip-Bu Tan,

who is one of three Board members of Voltron Data. The company is incorporated in Delaware and headquartered in San Francisco, California and has more than 100 employees, who work remotely from across the globe. Voltron Data was recognized by CRN in early 2023 as one of the "hottest big data startups." More than 80% of Voltron Data's employees are men.

3. Defendant Joshua ("Josh") Patterson was, at all relevant times, the Chief Executive Officer of Voltron Data. Patterson is a resident of South Carolina.

4. Plaintiff Akilah Rogers is an experienced and successful business leader. She is a graduate of Harvard Business School and earned a BA in economics from Williams College. Rogers has more than a decade of high-level, highly responsible business leadership experience, including several years of operations experience at venture capital-backed technology start-ups and Fortune 500 companies. Rogers worked as Vice President of Operations at Defendant Voltron Data from May 2022 until her unlawful termination in July 2023. Rogers is a Black woman and a resident of Washington, D.C.

## FACTUAL ALLEGATIONS

***Rogers Takes Over an Organization in Disarray and Turns it Around, While Being Paid Less Than Her Failing Male and non-Black Predecessor.***

5. In early 2022, Rodrigo Aramburu ("Aramburu"), a Non-Black male, served as Voltron Data's Chief Operating Officer ("COO"). Under Aramburu's leadership, the company's operations were in disarray, and relationships within the leadership team were poor. There was no human resources ("HR") department. The finance, legal, business operations, and communications functions were unprofessional and disorganized. Patterson and Voltron Data decided to replace Aramburu with someone competent to perform the functions of a COO.

6. Consistent with Voltron Data's and Patterson's standard practice for poor-performing men at the company, Defendants did not fire Aramburu. Instead, despite his poor

performance, Voltron transferred Aramburu to another important role, Chief Product Officer, and his compensation was not reduced. Defendants knew Aramburu was unqualified for his new role; still, the company sought to give its male executive a soft landing and another lucrative opportunity. However, Aramburu continued to perform poorly in his new role at the company and ultimately even needed to be placed on an official performance improvement plan.

7. At Patterson's direction, Voltron Data hired Rogers as Vice President ("VP"), Operations in May 2022. Even though Rogers directly took over Aramburu's role and responsibilities, reported to the CEO, and was hired to perform substantially similar work, Defendants gave Rogers a lower title and compensated her less than her male, non-Black predecessor.

8. After she joined the company, Rogers learned that Patterson had a checkered history with respect to the few women in critical roles at the company. At least three women were forced to leave the company because of Patterson's and Aramburu's mistreatment and hostility toward them. These revelations were concerning, but Rogers resolved to do what she could to ensure that the company's culture changed and that women at the company were protected and supported.

9. Applying what she learned at Harvard Business School and the lessons of her decade-plus of high-level business leadership experience, Rogers immediately righted the ship and professionalized Voltron Data's operations. She took on leadership of HR, legal, finance, business operations, and communications, and she created and led new hire onboarding sessions, oversaw Board meeting presentations, and served as an essential advisor to Patterson (speaking with him 2-3 times per day and on weekends to discuss business matters) and the company's C-Suite executives. In contrast to the chaotic, disorganized, and unprofessional environment that

had existed during Aramburu's tenure, Rogers developed and implemented business norms, best practices and policies, and created a more professional, effective business environment. She became the senior point person for investor relations and hired, onboarded, and trained several key leaders who were essential for the company's performance and growth.

10. Rogers's performance was outstanding, and Voltron Data's leadership—including and especially Patterson—recognized it. During Rogers's first year at the company, Patterson had no substantive criticisms of her work or performance. Patterson regularly told Rogers that she was one of the best hires he had made at the company.

***Rogers Asks for, and is Denied, a Title Change and Compensation Commensurate With Her Male Peers***

11. At a tech start-up like Voltron Data, equity is one of the most important and valuable forms of compensation. Rogers received dramatically less equity than her predecessor and the other male and non-Black VPs.

12. After an indisputably successful first year at Voltron Data, Rogers decided to advocate for the compensation warranted by her performance. In late April 2023, just before she reached one year of service at the company, Rogers asked Patterson for a title change and an increase in equity. Specifically, she asked for her equity to be increased to put her on a level playing field with similarly situated men at the company. Rogers backed up her request with detailed information and data reflecting her contribution to the company.

13. Patterson quickly responded to Rogers's request. Patterson acknowledged Rogers's outstanding performance and that she had a "Great Year 1, won't lie." He claimed that Rogers would only receive the title change if the case to the Board was a "no-brainer," and "we're not there yet." But Patterson had informed Rogers that the Board had praised her background and work. Furthermore, there were only three members of Voltron Data's Board—

and Patterson was one. Because the Board invariably followed Patterson's recommendations regarding personnel, it certainly would have agreed to the title change if Patterson had suggested it. Accordingly, Patterson himself had control over whether Rogers would receive the title and increased equity commensurate with the duties she performed.

***After Rogers Challenges Her Treatment as Discriminatory, Defendants Further Discriminate and Retaliate Against Her, Culminating in her Unjustified Firing.***

14. In May 2023, Patterson spoke directly with Rogers about her request for a title change and additional equity. Patterson again acknowledged Rogers's performance was excellent but refused to give Rogers the COO position she earned. Patterson falsely asserted that Rogers had to show that she could manage sales in addition to her current responsibilities if she wanted to be COO. Rogers responded by pointing out that Aramburu, her male predecessor, was appointed COO without managing sales. Rogers explained that the standards for her as a woman leader were higher than for Aramburu, a poorer performing male leader. She told Patterson that he was asking her to do the job of COO (and in fact, that she was already performing the job) before giving her the title. Rogers described this as the "plight of the professional Black woman"—having to overperform while being underpaid and underpromoted. Patterson (who is Black) didn't disagree. He acknowledged that "this is what we deal with" or words to that effect.

15. During this conversation, Rogers reiterated that, whether or not she was awarded the proper title, she believed she deserved additional equity, commensurate with her similarly situated male counterparts. Patterson was non-committal but directed Rogers to compile data supporting the request, which she did.

16. Around this time, the recently hired VP of HR, Mike Smart, acknowledged to Rogers that she was "basically the COO" of Voltron Data. Rogers asked if Smart was aware of her request to be COO, and Patterson's response, and Smart said he was not. Rogers then

5

discussed with Smart her request to Patterson for the title change and equal pay, and Patterson's negative reaction. She explained to Smart, as she had to Patterson, that she had to overperform while being underpaid and underpromoted because she was a Black woman. Smart responded that he had seen this happen with women—especially Black women—and used the phrase "moving the goalposts" to describe what Rogers was experiencing.

17. Over the ensuing weeks, Patterson took no action on Rogers's request for the title change or for equity in line with male VPs at Voltron Data. Instead, Patterson—who had only praise for Rogers before she spoke up, requested to be paid on par with men, and attributed her mistreatment to her race and gender—began undermining and disparaging Rogers publicly. Among other things, Patterson attacked Rogers on email chains and Slack channels, undermined her in front of her team and others she needed to work with at the company, suddenly removed her from projects and teams she was leading or part of, disinvited her from key leadership meetings, and heavily curtailed her decision-making authority.

18. Rogers reported most of these incidents to Smart, Voltron Data's HR VP, via email, Slack, and on video calls. She told Smart she believed Patterson was discriminating and retaliating against her. After one particularly egregious incident, she copied Smart into an email conversation with Patterson, who called a meeting that afternoon.

19. At the meeting—which was attended (virtually) by Patterson, Smart, and Rogers—Patterson made clear that he knew of, and was taking action against Rogers because of, her complaints of discrimination. Patterson began by expressing fury that Rogers had "brought in" HR. Without provocation, Patterson asserted that there was "no so-called glass ceiling" at Voltron Data, making apparent his awareness of (and anger about) Rogers's complaints of gender discrimination.

20. Before Rogers asked for the title change and equal pay, and challenged Defendants' discrimination against her on account of her race and sex, Patterson had no criticisms of her work performance, praised her as having a "[g]reat year 1," and said she was one of his best hires. After she complained, and "brought in" HR, however, Patterson dressed her down, accusing her of incompetence and lacking "understanding" of the business she had revitalized and professionalized. When Rogers asked Patterson to "stop retaliating" against her, Patterson responded derisively that he had been avoiding Rogers because he did not "want to trigger" her.

21. After her complaints, Voltron Data began a campaign to force Rogers from her job. Smart attempted to convince Rogers that she no longer wanted to work at the company in hopes she would resign. Rogers made clear that she still believed in the company and its mission and had no intention or desire to leave.

22. Voltron Data retaliated against Rogers in several ways, including by diminishing her and her job by taking away her responsibilities and delegating them to Rogers's subordinates. For example, Patterson bypassed Rogers, who was head of Investor Relations and Finance, and instead went directly to members of her team for an important funding report. Patterson had never bypassed Rogers like this before.

23. Having failed to convince Rogers to resign voluntarily, Defendants summarily fired her on July 10, 2023, less than three months after her request to be given the COO title and equal pay, and only weeks after she directly accused Defendants of discriminating and retaliating against her. Defendants claimed, pretextually and implausibly, that Rogers's position was being eliminated, even though she was performing essential operational functions that the company would still need. Furthermore, Rogers was one of the only employees at Voltron Data with direct

legal and finance management experience. Anyone who took over management of her team would have less management experience in those areas.

24. Despite being the CEO of a prominent start-up, Patterson was uncomfortable handling terminations of employees with clarity and dignity. Instead, he made employees uncomfortable to force them to quit or, for male employees, just let them underperform indefinitely. When Rogers joined the company, many told her that no one had ever been fired from the company. Thus, Voltron Data had virtually no termination protocols. It was Rogers who stepped up and established a fair process, script, and severance packages for all terminations at Voltron Data. Shockingly, however, Rogers was the first senior employee of the company whose termination was made effective immediately and without prior written notice of major misconduct, ongoing issues regarding the quality of a person's work, and/or multiple verbal warnings.

25. Defendants' summary firing of Rogers contrasted starkly with their gentle treatment of men who were failing to perform their duties. Despite performing poorly in every role he was handed, Defendants kept moving Aramburu to different positions, rather than terminating his employment or "eliminating" his position. In addition, a different male employee who simply stopped working—abandoning his job for months—remained in his position and continued to draw his salary and accrue unvested equity. Other men who were not working their scheduled hours, or performing their duties, remained employed without consequence. When Rogers or other leaders at the company would bring these issues to Patterson's attention during her tenure, Patterson refused to take action against the men who simply were not doing their jobs. In fact, Patterson repeatedly, personally intervened to save the jobs of poor performing (or non-performing) men at the company.

26. Similarly, in Rogers's tenure at Voltron Data, high-level men who asked for title changes, raises, and additional equity received what they asked for, without facing hostility or retaliation.

27. In addition, Patterson's behavior toward Rogers echoed his mistreatment of other women in important roles whom he discriminated against and pushed out during his short (less than a year and a half) tenure as CEO before Rogers's arrival.

28. Shocked by her plainly retaliatory and discriminatory termination, Rogers reached out to Voltron Data's biggest investor and key Board member Lip-Bu Tan, but received no response; to her knowledge, no investigation or corrective action was ever performed.

***Rogers Suffered Damages***

29. As a direct and proximate result of Defendants' conduct, Rogers has suffered wage and financial losses and irreparable damage to her career.

30. As a direct and proximate result of Defendants' conduct, Rogers has suffered severe emotional and mental distress, loss of reputation, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses.

31. By the acts and conduct described above, Defendants intended to cause Rogers severe emotional distress, or acted in reckless disregard of the injury that its actions had caused and would cause to Rogers.

32. Punitive damages are appropriate because Defendants' conduct was malicious and/or Defendants were recklessly indifferent to Rogers's protected rights.[1]

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff will file a charge of discrimination with the Equal Employment Opportunity Commission and the D.C. Office of Human Rights. Plaintiff intends to amend this Complaint to add Title VII claims after she exhausts her administrative remedies and receives a notice of right to sue from the relevant administrative agencies.

## COUNT I
### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981
**(Against All Defendants)**

33. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

34. Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including employment relationships.

35. By the acts and conduct described above, Defendants engaged in illegal intentional racial discrimination against Plaintiff in violation of 42 U.S.C. § 1981.

36. Plaintiff has been harmed as a direct and proximate result of Defendants' unlawful conduct.

## COUNT II
### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981
**(Against All Defendants)**

37. Plaintiff realleges Paragraphs 1 through 32 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

38. Section 1981 makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as challenging, reporting, and complaining to her employer about race discrimination.

39. Plaintiff engaged in protected activity by challenging, reporting, and complaining about race discrimination to Defendants.

40. Defendants took adverse employment actions against Plaintiff as further discrimination and in retaliation for engaging in this protected activity.

41. Plaintiff was subjected to and harmed by Defendants' further discrimination and retaliation after she complained about Defendants' racially discriminatory conduct.

42. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages.

## COUNT III
## PAY DISCRIMINATION (EQUAL PAY ACT)
### (Against All Defendants)

43. Plaintiff realleges Paragraphs 1 through 32 and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

44. The Equal Pay Act, 29 U.S.C. § 206(d), prohibits employers from discriminating "between employees on the basis of sex" by paying women less than men for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."

45. Both Defendants were "employers" under the Federal Equal Pay Act. 29 U.S.C. § 203(a, d).

46. Rogers was Defendants' employee under the Federal Equal Pay Act. 29 U.S.C. § 203(e)(1).

47. Defendants discriminated against Rogers on the basis of sex by paying Rogers less than men for performing equal work.

48. As a direct and proximate result of Defendants' discrimination against her, Rogers suffered damages. Rogers suffered damages each and every time she received a paycheck infected by the discriminatory pay discrepancy.

49. Defendants had no "good faith" basis for paying Rogers less than her male colleagues for equal work and lacked any reasonable basis for believing that their conduct was legal. Therefore, liquidated damages are appropriate. 29 U.S.C. §§ 216(b), 260.

## COUNT IV
## RETALIATION (EQUAL PAY ACT)
### (Against All Defendants)

50. Plaintiff realleges Paragraphs 1 through 32 and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

51. The Equal Pay Act prohibits retaliation against employees who complain about pay discrimination. 29 U.S.C. § 215(a)(3).

52. Both Defendants were "employers" under the Equal Pay Act. 29 U.S.C. § 203(a, d).

53. Rogers was Defendants' employee under the Equal Pay Act. 29 U.S.C. § 203(e)(1).

54. Defendants retaliated against Rogers by taking adverse employment actions against her, and ultimately terminating her employment, because she complained that she was paid less than men for equal work.

55. As a direct and proximate result of Defendants' retaliation against her, Rogers suffered damages.

56. Defendants had no "good faith" basis for taking adverse action against and firing Rogers because she complained about the pay discrepancy between her and male colleagues and lacked any reasonable basis for believing that their conduct was legal. Therefore, compensatory and punitive damages are appropriate. 29 U.S.C. §§ 215(a)(3), 216(b), 260.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find in her favor and against Defendants as follows:

a. Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981 and the Equal Pay Act;

b.  Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c.  Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

d.  Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e.  Award Plaintiff liquidated damages for Defendants' violations of the Equal Pay Act;

f.  Award Plaintiff punitive damages due to Defendants' malicious conduct and/or Defendants' reckless or callous indifference to the statutorily protected rights of Plaintiff;

g.  Award Plaintiff prejudgment interest;

h.  Award Plaintiff attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988; and

i.  Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By: ___*/s/ George S. Robot*___

George S. Robot
Linda D. Friedman (admission application forthcoming)
**STOWELL & FRIEDMAN, LTD.**
303 W. Madison Street, Suite 2600
Chicago, IL 60606
312-431-0888 (phone)
312-431-0228 (fax)